In re GUYANA DEVELOPMENT
CORPORATION, Debtor.

Bankruptcy No. 93–41444–H5–11.

United States Bankruptcy Court,
S.D. Texas,
Houston Division.

Oct. 8, 1996.

---

**464**

Marvin Isgur, Houston, TX, for trustee.

Louise P. Hytken, Dallas, TX, for Internal Revenue Service.

## AMENDED ORDER REGARDING FINAL APPLICATION FOR ALLOWANCE OF COMPENSATION AND THE REIMBURSEMENT OF EXPENSES BY DAVID ASKANASE, CHAPTER 11 TRUSTEE OF GUYANA DEVELOPMENT CORPORATION

KAREN KENNEDY BROWN, Bankruptcy Judge.

### I. Background

In February 1993, Guyana Development Corporation (GDC) filed a voluntary petition under Chapter 11 of the Bankruptcy Code. Shortly after the commencement of the bankruptcy proceeding, the United States instituted litigation against the debtor eventually leading to a motion in October 1993, requesting the Court to appoint a trustee over the bankruptcy estate. The debtor vigorously opposed this motion. This Court conducted an extensive evidentiary hearing. During the course of the hearing, there was substantial evidence introduced regarding both pre-petition and post-petition fraudulent conduct by the debtor's principal, Edward Callan and his agents.

The Court appointed the trustee on December 15, 1993. David Askanase was selected by the U.S. Trustee's office and accepted appointment as chapter 11 trustee for this estate. Upon his appointment, the trustee was immediately thrust into the on-going long and bitter trial between the debtor, its principal, Edward Callan, and the Internal Revenue Service (IRS). The litigation concerned, in part, whether the trustee should be permanent; the extent of the assets of the estate; the validity of an agreement between the debtor, Callan, and the United States resolving tax issues; the use of alter ego theories to pierce the corporate veil between debtor, its numerous affiliated companies, and Callan; the existence of fraud in the operation of the estate; the status of certain Internal Revenue Service liens; and the ownership of Miami Real Estate Venture IV, Inc. and other related entities.

Upon the trustee's appointment, the Court proceeded with the on-going trial and the trustee and his counsel became intricately involved in the court proceedings, familiarizing themselves regarding the background of the litigation during off hours of the trial. The trustee by his counsel participated in the balance of the trial, assisted in the cross-examination of witnesses, coordinated the presentation of over 100 exhibits to the Court, and commenced closing arguments at the conclusion of the trial. As a result of the trial, this Court issued an extensive opinion in February 1994, subsequently amended in May 1994, ordering that the corporate veil be pierced between debtor, Callan, and several of the affiliated companies.

Upon his appointment, the trustee faced an array of complex problems including: multiple litigation matters in five different countries; seizing or freezing estate property both domestically and in several foreign countries; preserving value and minimizing contingent liabilities in the estate's rapidly expiring oil and gas interests; coordination of settlement negotiations between the various major parties-in-interest in this case and coordination of the litigation over allowance or priority of more than $230 million of claims asserted against the estate.

### Books and Records

Although the debtor filed schedules and statements of affairs at the initiation of the case, these pleadings did not accurately reflect the assets of the estate and provided little pertinent information to the trustee regarding debtor's world-wide interests.[1] Debtor's schedules reflected that GDC's total assets were $8,043,387. Of this sum, howev-

---

1. For example, the schedules reflected that the value of the Guyana Joint Venture Partnership (GJVP) was $-0- whereas the trustee was ulti- mately able to recover in excess of $20,000,000 in assets owned through the GJVP entity.

er, $5,250,000 was already paid pre-petition to the IRS in connection with a pre-petition written agreement between debtor, Callan, and the IRS. Accordingly, the total assets shown in the schedules to be under GDC's control were approximately $2,700,000. The estate had approximately $300,000 in cash at the time of the trustee's appointment.

When appointed, the trustee discovered that debtor's books and records were in total disarray. The landlord of debtor's Houston office locked out debtor and the trustee had to negotiate a settlement simply to obtain access to debtor's records. The records stored in that office were disorganized and scattered. Some records were maintained on a computer system so old that access was difficult; some were contained in locked file cabinets; and some were spread out on tables. Some of debtor's records were held by the F.B.I., some by the district attorney's office, and some by Callan's various attorneys in Houston and world-wide. Simply locating and organizing debtor's records took considerable effort and the process continued throughout the early weeks after the trustee's appointment. There was no guide for the trustee to make sense of debtor's information.

The general disorganization of debtor's records was compounded by debtor's insiders' deliberate attempts to misappropriate debtor's records. Insiders moved records over the world. The trustee discovered some of debtor's records in the back of an automobile in London, England, and some on a truck at another Houston location. To surmount these obstacles, the trustee obtained a series of emergency orders to preserve the estate's books and records. Despite these impediments, the trustee recovered, organized, and analyzed debtor's books and records.

**Asset Freeze Orders**

Callan's obstructive actions and the worldwide location of debtor's assets, caused the trustee to seek and to obtain a series of court orders regarding the extent of his authority immediately after his appointment. At the trustee's request, this Court issued orders freezing various assets around the world and declaring that the trustee was the sole representative of the estate.

**Foreign Litigation**

The trustee assembled an international team of litigation and transactional lawyers to take control of the estate's widespread assets and business interests. Foreign counsel were averse to working without retainers and unused to bankruptcy court restrictions on their compensation.

**GDC Insiders**

The trustee was hindered in every possible way by the actions of Edward Callan, his spouse, and Callan's associates. GDC insiders sought to prevent the estate from obtaining millions ultimately recovered by the trustee and sought to thwart creditors from recovering any meaningful dividend on their legitimate claims.

The debtor's principals and insiders refused to cooperate with the trustee or to provide access to documentation concerning Callan's complex web of domestic and offshore business structures. Insiders committed pervasive fraud. Insider-directed litigation and asset disposition increased the professional and other administrative expenses beyond those that otherwise should have been incurred in this case.

Upon the appointment of the trustee, Callan directed his associates to retain counsel and to oppose in the courts of London, England and the Isle of Man the legitimate efforts of the trustee to exercise his sole authority and control over the affairs and assets of debtor's international affiliates. This Court ordered Callan to halt the litigation and Callan refused to comply. In early January 1994, the trustee initiated an emergency civil contempt proceeding against Callan. This Court held Callan in civil contempt of its orders; Callan was arrested and held by the United States Marshal until he purged the contempt. To purge himself of contempt, Callan disclosed Swiss bank account numbers and authorized those account funds turned over to the trustee.

Thereafter, Callan was released from custody but was ordered to surrender all of his passports. Although he surrendered his United States passport, Callan subsequently

left the United States. Callan's interference with the trustee's administration of the estate did not cease after he went to jail for civil contempt.

The trustee authorized and oversaw the vigorous defense of the estate from efforts by former GDC insiders, particularly Deborah Callan, to obtain preferential and premature dividends regarding (i) claims alleged by such insiders against the estate, and (ii) alleged interests in property of the estate. The result of the trustee's efforts is that the Court declined to allow any such former insider claims to obtain any meaningful dividend from the estate. The estate was preserved for legitimate claimants.

### Letters of Credit and Oil and Gas Properties

Petromineros del Peru, Ltd., Casamance Petroleum (Senegal), Ltd., Balkan Explorers (Bulgaria), Ltd., and Karak Petroleum (Pakistan), Ltd. were four subsidiaries of Guyana Joint Venture Partnership, a joint venture between debtor and another Callan entity, Eldorado, an Isle of Man entity. Each of these subsidiaries of GJVP owned a contractual right from a foreign government to explore for and develop oil and gas in the particular foreign country. By order dated January 3, 1994, this Court determined that GDC was the sole beneficial owner of GJVP and directed the trustee to exercise exclusive control over GJVP's subsidiaries.

During the chapter 11 case, unbeknownst to the Court, the creditors, and the trustee, GJVP pledged millions in cash to secure letters of credit to fund drilling operations for these subsidiaries. At the time of the trustee's appointment, the estate was just days away from losing millions through unauthorized draws against these letters of credit. During the Christmas holidays of 1994, the trustee discovered a series of letters of credit located in the Isle of Man and England worth in excess of $6 million issued by Bank Julius Baer–Zurich, Switzerland in favor of these GDC subsidiaries. These letters of credit designed ostensibly to fund drilling operations were secured by funds belonging to the estate and could be drawn by persons other than the trustee without just reason or the trustee's consent. For example, the English

letter of credit could be drawn by anyone with an invoice to Balkan Explorers without need of a bill of lading. The funds securing the letters of credit were vulnerable to fraud.

Between December 28, 1993 and January 1, 1994, the trustee telephoned Switzerland and confirmed the existence of outstanding draws against the letters of credit. In response, the trustee sought voluntary agreements from the financial institutions involved to not allow draws on either the accounts or the letters of credit without the trustee's authorization but the foreign financial institutions refused. Consequently, the trustee immediately instituted emergency litigation in London, England and the Isle of Man to seize funds already drawn under the letters of credit. The trustee was able to freeze approximately $2 million in London and substantial monies in the Isle of Man.

The trustee's decisive actions in initiating this foreign litigation preserved the estate property. Absent such action, the funds represented by the letters of credit would have been dissipated without the trustee's authorization. Undertaking this foreign injunctive action was risky because had the trustee lost the foreign proceedings, and been found by the foreign courts not entitled to relief, he and the estate might have been held liable for wrongly interfering in international commerce and might have incurred enormous legal fees and damages against the estate.

After freezing the letter-of-credit funds, during the first six months of 1994, the trustee oversaw the successful negotiation of interim agreements with the corporate representatives of GDC's oil and gas affiliates to allow the trustee to use some of the funds frozen in the Isle of Man litigation to pay ongoing expenses necessary to preserve the estate's interest in these foreign oil and gas properties. During the latter part of 1994, the trustee authorized and assisted in the coordination of the litigation in the Isle of Man to determine the entitlement to the remaining funds "frozen" in that litigation. Literally, on the Isle of Man courthouse steps, the trustee negotiated and coordinated a settlement with the adverse parties in the English and Isle of Man litigation that resulted in the adverse parties receiving $295,000

from the remaining $3.5 million of "frozen" funds. Under the settlement, the balance of the funds were transferred to the estate. Including valuation of other property interests involved in the settlement, the net value of the settlement to the estate was in excess of $4.5 million.

In connection with these GJVP oil and gas entities generally, the trustee coordinated the work of professionals for the oil and gas affiliates to oversee the management of the affiliates' oil and gas concessions. By utilizing the oil and gas professionals most familiar with each respective concession, the trustee avoided the prohibitive cost of educating new oil and gas professionals to manage the affiliates' affairs.

The trustee also authorized and oversaw the negotiation of a settlement with various former employees of the oil and gas subsidiaries who had asserted claims attributable to oil and gas interests in the foreign oil and gas concessions. Under the settlement, the individual claimants essentially waived their claims against the estate in return for the estate's equity in certain of the oil and gas subsidiaries. Not only did this settlement resolve potentially burdensome litigation regarding those individual claims, but the transfer of the oil and gas subsidiaries reduced the estate's contingent liability risk related to holding each subsidiary.

The trustee's measured management of the oil and gas affiliates benefitted the estate in two respects: (i) minimizing the maturation of large contingent liabilities into potentially burdensome claims that could have diluted the dividend to be paid on legitimate allowed claims; and (ii) preserving and recovering for the estate the residual value of the estate's interest in the oil and gas affiliates despite Callan's initial poorly conceived investment in those affiliates. Had the trustee improperly managed the liquidation of these assets the estate would have had $25–30 million more in claims from oil and gas affiliates. The trustee's efficient management approach minimized liability to the estate in a high risk business and avoided substantial dilution of the dividend to be paid on allowed claims.

## Petromineros del Peru, Ltd.

Petromineros del Peru, Ltd. is an Isle of Man corporation whose only known assets are potential claims against Quintana Minerals Corporation arising out of an expired exploration license for Block 50 granted to Petromineros by the Peruvian government and stock in the Peruvian national phone company. Petromineros has potential liabilities for significant claims by the Peruvian government for unpaid taxes.

Immediately prior to the trustee's appointment in this case, Edward Callan Interests (which previously controlled Petromineros' management) reached an impasse with potential investors in the Peruvian concession. As a result, the Peruvian concession was scheduled to terminate on January 23, 1994, only one month after the trustee's appointment, unless an additional $1.2 million was deposited by Petromineros to secure its drilling obligations under the Peruvian concession.

The trustee determined that it did not make economic sense for the GDC estate to deposit $1.2 million without additional investors in the Peruvian concession. Moreover, as a result of interference in obtaining control over the records relating to the Peruvian concession, the trustee did not have possession of the technical data and other documents that investors normally require before committing to an investment of the magnitude required under the Peruvian concession. Finally, even with access to such investor information, finding and arranging for a competent investor in the Peruvian concession within a month presented a difficult undertaking given the size and complexity of the investment necessary in Block 50.

Notwithstanding these obstacles, the trustee preserved an interest in the Peruvian concession for the estate. After efforts to re-engage the most likely investor in the concession failed, the trustee authorized the solicitation of the most likely oil and gas companies to make an investment of the size and risk represented by the Peruvian concession. The trustee's efforts resulted in the estate receiving (i) a $1.2 million investment commitment in the Peruvian concession from an independent oil and gas company with

extensive experience in exploration and development of foreign oil and gas projects, and (ii) emergency bankruptcy court approval of that commitment. The trustee's efforts preserved in the estate an interest in the Peruvian concession which, at the time of the trustee's appointment, was unsalvageable. During the third quarter of 1994, the trustee recovered approximately $300,000 that otherwise would have been lost to the Peruvian government as security for certain unfulfilled drilling obligations.

Eventually, after Petromineros' oil and gas concession expired as a result of a title defect, the trustee authorized and oversaw the auction of Petromineros. That auction generated another $300,000 for the benefit of the estate, half of which the trustee has proposed to pay to oil and gas professionals employed by the estate's oil and gas affiliates during the pendency of the case in part to settle those professionals' claims against the estate. Consequently, the trustee's efforts (i) preserved for the estate an interest in the Peruvian concession which, at the time of the trustee's appointment, was for all practical purposes unsalvageable, (ii) directly resulted in the recovery of approximately $300,000 for the estate that otherwise would have been lost to the Peruvian government, (iii) minimized the maturation of potentially large contingent liabilities related to Petromineros into claims that could have diluted the dividend that will be paid on allowed claims in this case, and (iv) resulted in $300,000 from the sale of Petromineros.

### Balkan Explorers (Bulgaria) Ltd.

Balkan Explorers (Bulgaria) Ltd. is an Irish company whose primary asset was a petroleum, exploration, and production license granted by the Bulgarian Committee of Geology and Mineral Resources for Block 91–I, Shabla Offshore, Bulgaria. In order to maintain its rights under the concession, Balkan was required to pay certain fees to the Bulgarian government exceeding $200,000. Absent a sale of the estate's interest in this undertaking, the estate would have been in default under the concession and would have liabilities to the Bulgarian government exceeding $1 million. The trustee authorized and oversaw the negotiation and approval of

a settlement of a drilling contractor's claim against Balkan for $600,000, or approximately 25% of the amount of the contractor's original claim. The settlement of that claim cleared the way for the trustee to negotiate a farm-out of the concession. In March 1995, the trustee obtained court approval to sell the estate's interest in Balkan. In exchange for the sale, the estate received a 20% carried working interest, convertible to a 4% royalty interest. Eventually the trustee sold Balkan entirely for value to the estate. The trustee's management of this litigation matter resulted in the removal of yet another large potential liability against the estate.

### Casamance Petroleum (Senegal) Ltd.

Casamance is an Isle of Man entity. Its primary asset is a contractual right concerning the development of oil and gas prospects in a block of acreage in Senegal. Under this concession, the estate had an unlimited monetary obligation to the government of Senegal to develop without regard to the cost to the estate. The trustee oversaw negotiations with representatives of Casamance to modify and extend drilling requirements under the Senegal concession. The trustee facilitated the engagement of an institutional investor to underwrite the largest share of the drilling and development costs attributable to that concession and thereby reduced the estate's risk and liability under the concession. The trustee's management strategy for this concession resulted in the preservation of the concession for the benefit of the estate and, more importantly, the forbearance from assertion and ultimate waiver of any claims against the estate from potential creditors involved in that concession.

### Karak Petroleum (Pakistan) Ltd.

Karak is an Isle of Man entity. Karak's primary asset was a contractual right concerning the development of oil and gas prospects in a block of acreage in Pakistan. In late 1994, the trustee oversaw and assisted in the negotiation and emergency court approval of a transaction between Karak, Tullow Oil, and the Government of Pakistan that preserved Karak's interest in an oil and gas concession being developed by Tullow in exchange for the use of $1 million that Karak would have otherwise forfeited to the Gov-

ernment of Pakistan. The trustee's efforts in this regard resulted in the potential for the estate to recover an oil and gas interest of material value where the alternative was simply the complete loss of $1 million. This transaction ultimately allowed the trustee to sell Karak for value to the estate and avoid allowing potentially large contingent liabilities to mature into claims that could dilute the dividend to be paid to allowed claims in this case.

### $9.5 Million

Barely a month after the trustee's appointment, GDC insiders attempted to steal $9.5 million from the GDC estate by transferring those funds into and out of a series of foreign nominee accounts in England, Switzerland, and Germany until discovered and caught by the trustee. During the initial litigation before this Court, GDC insiders and their representatives indicated that $9,500,000 of estate funds were on deposit at the Arab Banking Corporation (ABC) in London, England (i) secured by a letter of guaranty issued by ABC in favor of the Libyan National Oil Company to insure North African Petroleum, Ltd.'s (another Callan entity) performance under a Libyan oil and gas concession and (ii) was frozen due to NOC's refusal to release ABC's guaranty.[2] The trustee investigated and discovered that these representations were false and were intended to shield a laundering scheme by Callan and his associates to steal the $9.5 million from the GDC estate. Despite representations by the debtor's agents that the funds in London were frozen pending the outcome of the Libyan venture, the funds were in fact available for transfer. After the trustee's appointment, insiders transferred the funds from the Arab Banking Corporation–London to ANZ–Grindlay's Bank–New York, to Bayerische Hypotheken Und Wechsel Bank–New York for the benefit of Bayerische Hypotheken Und Wechsel Bank in Munich and from the Munich bank to Hypobank International S.A. in Luxembourg to a German mark account under the name of a German real estate asset management firm Referenzbau Gesellschaft Fur International Vermogensanlagen Gmbh ("Referenzbau").

Referenzbau sought to keep the money ostensibly to invest in a housing project for the elderly located in Spain.

Upon discovering the trail of the stolen funds and despite the extraordinary difficulties involved in tracing money through the secrecy-laden Swiss banking system, the trustee immediately instituted litigation in the United States, England, and Luxembourg to enjoin further transfers and to recover the funds. After freezing the funds, the trustee oversaw the successful prosecution in the United States of litigation against GDC insiders and Referenzbau concerning the transfers. The trustee obtained a judgment from this Court declaring the trustee's entitlement to the money and assessing damages against Referenzbau for its involvement in attempting to divert those funds from the estate. Contemporaneously, the trustee authorized the commencement and prosecution in Luxembourg of litigation that resulted in a judgment under Luxembourg law that recognized the trustee's claim to the $9.5 million and appointed a receiver over the $9.5 million pending a final court determination in Luxembourg of the owner of the funds. Finally, after extensive negotiations, the trustee settled the Luxembourg litigation that resulted in the (i) transfer of the $9.5 million to the trustee's control; (ii) dismissal of the Luxembourg litigation over the $9.5 million; and (iii) payment of $450,000 to Referenzbau in full and final satisfaction and settlement of Referenzbau's claim of entitlement to the $9.5 million. Furthermore, the entire $450,000 settlement amount was generated from currency exchange gains attributable to the $9.5 million after the trustee froze the funds in Luxembourg.

### The Florida Power and Light Building

During this case, the sole profitable asset under the control of the debtor was the Florida Power and Light building (FP & L) located in Miami, Florida, 2–3 blocks away from the central business district. The trustee undertook to liquidate this asset for the benefit of the estate. The building's value was wholly dependent on a lease negotiated by Callan with the FP & L Company. The FP & L Company had contracted with

---

**2.** Despite U.S. laws that prohibit most commercial transactions with the Country of Libya.

Callan for an above market twenty-three year lease with rent payments of $370,000 per month. With the lease, the building was worth $40 million; without it, the building was worth $6–8 million.

In order to market the building for the highest price, the trustee sought to obtain an estoppel letter from the FP & L Company regarding its lease of the building. However, the FP & L Company refused to execute an estoppel letter on the lease and threatened to vacate the premises and cease paying rent. It vacated two floors of the ten floors subject to the lease and claimed Callan induced the lease by fraud, an allegation the trustee would have been hard pressed to defend against given this Court's rulings concerning Callan's fraudulent schemes. Most importantly, the lease was payable monthly with no provision for acceleration, necessitating the institution of a new lawsuit by the trustee against the FP & L Company for accrued past due rent for each breach during the entire remainder of the 23 year term of the lease.

After the bid process was under way and the trustee stood firm against the FP & L Company threats, the FP & L Company made its own bid for the property. After further negotiations, the trustee accepted the FP & L Company bid subject to court approval.

Thereafter, third-party bidders on the FP & L building for their part saw FP & L Company's refusal of an estoppel letter and later joinder in the bid process as collusion between the trustee and the FP & L Company. The result was a contested hearing at which the trustee testified. Despite these impediments, the trustee eventually negotiated and closed the sale of the FP & L building to the FP & L Company with the sale generating over $13 million in equity to the estate and the payment of over $35 million of secured claims against the estate. The trustee believes and this Court concurs in the view that his aggressive stance in other litigation on behalf of the estate convinced the FP & L Company to eventually cooperate.

## Sale of Personal and Real Property and Recovery of Additional Cash Assets for the Estate

The estate owned directly or indirectly numerous real and personal property interests including: (i) the FP & L building located in Miami, Florida; (ii) a condominium located in Houston, Texas; (iii) two flats located in London; (iv) an estate located in Massachusetts; (v) a Caribbean island, South Cat Cay; (vi) interests in oil and gas ventures around the world; and (vii) other assets. These asset sales produced in excess of $60 million in gross sales proceeds.

### The M/V Scorpion

The M/V Scorpion is a yacht moored at the Hurricane Hole Marina in Nassau, Bahamas, which Callan purchased post-petition in June of 1993 for $385,000 using estate funds. The trustee sought a court order to obtain control over the yacht. The trustee sold the M/V Scorpion raising over $300,000 for the benefit of the estate.

### 13 Upper Berkley Street

In 1995, the trustee oversaw the sale of the estate's interest in "13 Upper Berkley Street." The estate held an interest in a 60–year leasehold in the upper maisonette at 13 Upper Berkley Street in London, England. The sale was complicated by the freehold interest owner who attempted to block the sale under a 1993 English statute. The trustee oversaw his London counsel's work in ultimately persuading the freehold interest owner to withdraw his objection to the sale. The estate received in excess of $400,000 from the sale.

### One Arlington Street

The trustee sold the estate's interest in One Arlington Street, Winchester, Massachusetts, for a cash price of $1,300,000.00.

### 15 Hyde Park Square

Also in 1995, the trustee oversaw the sale of the property known as "15 Hyde Park Square." This involved the sale of the estate's interest in a long-term leasehold in 15 Hyde Park Square, London, England. The property was initially unsaleable as it did not comply with governmental restrictions and local building codes. Furthermore, Deborah Callan, Edward Callan's current spouse, and

an associate attempted to halt the sale by clouding title to the property. Again, the trustee authorized and coordinated with his London counsel to negotiate a compromise to the satisfaction of the relevant authorities, the purchaser, and the trustee. The title defects created by Ms. Callan and her associate were cured and the sale proceeded. The GDC estate received approximately $550,000 from the sale.

## Miscellaneous Property

Finally, in 1995, the trustee also recovered miscellaneous cash for the estate in excess of $1 million, including (i) approximately $840,000 previously frozen in a Swiss bank account; (ii) $170,000 held in a GDC insider attorney's account in Switzerland; and (iii) approximately $212,000 attributable to the sale of South Cat Cay, $202,000 of which was credited to the $1 million purchase price for that property when the trustee closed that transaction in early 1996.

## Oversight of Claims Litigation

Eighty-two claims [3] totaling in excess of $230,000,000 were filed against GDC. The trustee reviewed all filed claims and decided which were objectionable and which were permissible. The trustee decided on the approach for each objection and prosecuted a large number of claims objections in the form of either contested matters or adversary proceedings. The trustee objected to the allowance of over half of the total number and over 80% of the amount of the claims. The trustee's management of claims litigation has reduced the allowed amount of those claims to a small fraction of the total alleged amount and substantially increased the dividend that allowed claims will receive.

## Gandalf Explorers International, Ltd.

Gandalf and its insiders filed claims exceeding $26,000,000 relating to a part of the estate's interest in the failed Balkan Explorers Bulgaria, Ltd., Bulgarian drilling program. The trustee evaluated the Gandalf claims as not allowable and expended substantial resources in defending the estate against these claims because allowance of such claims would have substantially diluted the dividend that would otherwise be recovered on account of valid allowed claims. Much of the litigation involved facts pertaining to Balkan Explorer's negotiations with a Bulgarian governmental unit and Gandalf principals over Bulgarian oil and gas interests. The foreign nature of the litigation drove up the litigation cost, and prompted the trustee to propose a settlement for a payment by the estate of an amount that is a small fraction of Gandalf's claims.

## Confirmation that the "Asher Transaction" Was a Fraud on the GDC Bankruptcy Estate

Prior to the trustee's appointment, debtor's insiders sought to sell the GJVP oil and gas concessions for $260,000 to Asher, Ltd., an Isle of Man entity. During the trustee's investigation of GDC's affairs, he discovered corroborating evidence that the Asher transaction was a fraud on the GDC bankruptcy estate.

## General Administrative Matters

In addition to the previously described activities, the trustee engaged in general administrative matters including: the review of all proposed pleadings dealing with fee applications; general correspondence; meetings with accountants for tax planning and tax filings; meetings with attorneys to discuss strategy, documents, and general pleadings; review of financial and operating reports; and review of all bills involving such matters.

## The Plan

To facilitate confirmation of the plan, the trustee litigated the priority of a portion of the IRS' claim against the estate. Inasmuch as the IRS' claim is the largest allowed claim against the estate, the resolution of this litigation was a key element to finalizing the structure of the trustee's Plan of Reorganization and Disclosure Statement. The Court issued an extensive opinion regarding the claims brought in the lawsuit. The opinion generally provides that (i) the United States' liens against the GDC estate covered all of the assets of the estate, including those assets located overseas; (ii) the trustee is entitled to avoid those liens against stock owned in corporate entities and retain those assets derived from the ownership of stock for the

---

3. Some of these claims were duplicates.

benefit of all creditors; and (iii) the levies imposed by the United States were avoided to the extent that the levies were to be applied to the penalty claims of the United States. Although the Court avoided the levies that applied to the penalty claims, the Court did not avoid the liens that secured the penalty claims.

The Court's ruling prompted a final settlement between the trustee and the IRS regarding handling of the IRS's claim under the trustee's plan of reorganization. As a result of that settlement, the trustee finalized and filed his plan of reorganization and disclosure statement, which incorporates the trustee's settlement with the IRS. The trustee decided what the plan and disclosure statement should include, reviewed drafts of both, approved the final versions, and sought and obtained court approval of the disclosure statement and confirmation of the plan. The trustee's plan provides for the liquidation of the debtor. The trustee determined that the debtor should be liquidated rather than reorganized because all of debtor's operations other than the FP & L building were unprofitable and highly speculative, debtor's management were fired and other employees had fled pre-petition, and the secured claim of the IRS was so large compared to the debtor's available capital.

Under the plan, the IRS claim of $31,778,014.01 will receive $31,031,268.19 or 97.65% of its total claim. The penalty portion of its claim has been subordinated to payment of unsecured claims. The IRS received its principal of $18,679,396 by wire payment recently; its interest of $6,875,787.01 was paid during the course of the case and the trustee anticipates that under the plan, the IRS will receive $5,476,135.28 of its penalty of $6,333,881.00.

On April 30, 1996, the Court confirmed the trustee's first amended plan of reorganization. As a result of his efforts, the trustee estimates that the dividend to be paid in this case to holders of general unsecured claims, including the IRS' penalty claim, will be over approximately 88%.

## II. Requested Compensation

The trustee seeks the maximum compensation under 11 U.S.C. § 330, as limited by sec. 326(a), in the amount of $2,398,348.63, plus the reimbursement of expenses of $15,833.42 based on total disbursements in the case of $79,938,954.41. The trustee has previously received court-approved advances in the amount of $585,000, plus the reimbursement of $11,450.06 in expenses. Thus, the trustee seeks the further sum of $1,813,348.63, plus expenses of $4,383.36. The U.S. Trustee does not oppose payment of the maximum fee.

## III. IRS Contentions

The United States contends that when the trustee initially came into the case, it had already developed a considerable amount of evidence concerning debtor's assets. The attorneys for the United States, with the assistance of the IRS agent assigned to the case and several witnesses, had developed a considerable amount of information which had been presented to the Court. The United States provided the trustee with a great deal of information on assets and also provided the names of former employees who had information on the location of assets. All of this information, asserts the IRS, as well as access to the agent and the witnesses, were provided to the lawyers for the trustee.

The United States contends that because it agreed to subordinate its lien to the administrative expenses of the trustee, the trustee took over the case with millions of dollars of assets in hand, including $1,174,597 in a brokerage account at A.G. Edwards, $1,893,723 in an account at Lind Waldock, $566,045 from an IRS levy on NationsBank, and $54,000 from an account at Chase Manhattan which the IRS turned over to the estate. The United States had also encumbered the FP & L building with its nominee lien.

While the IRS concedes that this case involved some unusual features, it contends that the case was not complicated because there was no creditors committee, no reorganization of a business, and only one creditor, itself, active in the case. Debtor's activities, according to the IRS, were fairly minimal because it had no employees, there were no lenders to negotiate with, and there was only one major creditor. Further, the sale of the FP & L building was so simple Coldwell

Banker sold it for a low commission. The IRS disputes that there were $230 million in claims filed because a number of the claims were filed by insiders and Mr. Callan's family. Miami Real Estate Venture (MREV), a subsidiary of GDC, filed a claim for $3,616,777, and Edward Callan filed a claim for $51,635,287. The IRS asserts that the trustee took over a case where the facts were well developed and documented and where he had the assistance of the Tax Division, the IRS, multiple former employees, and consultants of Edward Callan Interests (ECI). He undertook to liquidate the estate not reorganize it.

In addition, the IRS contends that it is inappropriate to include the full amount of the sales price of the FP & L building in a base for computing the limit on the trustee's compensation because the property was encumbered by a first lien of $36,000,000 in favor of NationsBank and the IRS nominee lien in the approximate amount of $38,000,000 had already secured the equity in the building for the benefit of the estate.

In view of the previous discussion of events, it is evident that the last two and one-half years of these proceedings involved more than a trustee stepping into the final stage of a simple liquidation. The cooperation of the IRS in supplying the trustee with all the information in its possession was commendable and appropriate. Possessing information, however, is not the same as successfully acting on it.

The trustee aggressively administered the estate assets. Since his appointment, the trustee has been the sole decision-maker for the estate's numerous business enterprises which included over a dozen different subsidiaries and affiliated businesses' entities. These enterprises were primarily involved in high risk oil and gas and real estate investments in more than a dozen foreign countries, including England, Isle of Man, Ireland, Bulgaria, Romania, Senegal, Columbia, Pakistan, Peru, Bahamas, Russia, Czech Republic, Germany, Spain, and Sharjah, an island off the coast of Iran. Liquidation rather than reorganization was the only suitable resolution of this estate given the rampant fraud perpetrated by Callan in his business dealings, and the far-ranging and widely divergent investments of which the estate assets consist. There were no employee jobs to protect through reorganization. Employees for the most part had fled the debtor before the appointment of the trustee. Similarly, the estate had no reliable management to continue operations. Those individuals remaining involved with the debtor after the appointment of the trustee were exposed as active participants in Callan's continuing fraud. Continuation of the highly speculative and unprofitable business operations of the debtor would have required enormous further investment of estate assets and would have resulted in the loss of any meaningful recovery for the unsecured creditors and the IRS.

As to the IRS' contention that its lien preserved the FP & L building's equity for the estate, the Court credits the trustee's testimony that the IRS lien was a signal to potential bidders to "low-ball" their offers to purchase the building because prospective purchasers tend to take advantage of a distress sale. It is axiomatic, moreover, that the market value of real property is not determined or preserved by the amount of encumbrances against the property but by the price reached through the arms-length negotiations of a willing buyer and willing seller. The IRS would have recovered nothing on its lien had the FP & L Company deserted the building and breached its lease. But for the trustee's persuasive negotiations with the FP & L Company which retained the lease and preserved the value of the building, the company would have vacated and the building undoubtedly would have eventually been foreclosed by NationsBank as first lienholder with no equity for the creditors.

The trustee also testified that in his overseas activities the IRS' involvement in the case proved to be a hindrance because foreign courts were not interested in assisting or cooperating with the trustee when they perceived him to be a collection surrogate for the IRS for payment of U.S. taxes. Indeed, on its own, the IRS has no method to obtain the approximately $18 million in estate assets located outside the borders of the

United States on the petition date. It is a well-settled principle of international law that one nation's courts will not enforce the tax claims of foreign nations.[4]

■ Similarly, once bankruptcy was filed, the IRS, as a creditor, had no standing to allege an alter ego theory against the myriad corporate entities controlled by Callan. *Matter of S.I. Acquisition, Inc.*, 817 F.2d 1142 (5th Cir.1987). The bulk of the funds alleged by the IRS to be on hand at the appointment of the trustee were held in the name of affiliates of GDC rather than the debtor, necessitating the involvement of the trustee and the conclusion of litigation to bring the funds into the estate.

■ As to the allegation that the basis of the trustee's percentage compensation should not include the encumbered portion of the FP & L building, Bankruptcy Code section 326(a) plainly states that the basis for computation of the percentages under that section include "all moneys disbursed ... in the case by the trustee to parties in interest ... including holders of secured claims."[5] Thus, it is appropriate to include the full amount of the proceeds of the sale of encumbered property in the basis for the percentage computation.

Notwithstanding its objections, the IRS does not complain about the quality of the services rendered by the trustee to the estate or the amount of funds available for distribution. It complains simply that the trustee did not expend enough actual time to justify the fee requested. The IRS' analysis ignores, however, that in bankruptcy administration, speed and efficiency are desirable attributes. The trustee's goal and, indeed, duty, is to achieve the largest possible distribution to creditors in the shortest amount of time, whether through reorganization or liquidation of the estate. Instead of prolonged litigation, the trustee reached early and speedy settlements to the benefit of all creditors.

## IV. Lodestar v. Percentage

■ The core issue then is whether the trustee may be compensated based on a percentage of disbursements in the case in accordance with 11 U.S.C. § 326 or only under a strict lodestar analysis of hours worked multiplied by an appropriate hourly rate. The IRS asserts that the trustee may be compensated only under a lodestar calculation. The IRS contends that the lodestar should consist of an hourly rate for the trustee of $300, which is $100 more per hour than the trustee's usual hourly rate for legal services of $200. This hourly rate then should be adjusted upward by a multiplier of two for a total hourly rate of $600. This hourly rate then should be multiplied by the hours worked to produce a total fee of $866,370.00.

Thus, even the IRS agrees that the trustee's hourly rate as an attorney multiplied by the hours worked does not result in a reasonable fee for the trustee in this case. Similarly, this Court finds that the lodestar does not equate to reasonable compensation in this case.

■ The IRS notes that section 326 plainly sets out the maximum compensation available to a trustee, not an entitlement to the percentages there listed. This analysis is

---

**4.** The United States courts will not enforce the tax claims of foreign nations. *Her Majesty Queen in Right of Province of British Columbia v. Gilbertson*, 597 F.2d 1161 (9th Cir.1979). Similarly, foreign nations will not enforce the tax claims of the United States. *See e.g., Government of India v. Taylor*, 1 Eng.Law Rep. 292 (House of Lords 1955); *In re Tucker*, Manx Law Rep.1987–89, Ch. D. (Chancery Division 1988); *Peter Buchanan, Ltd. v. McVey*, The Law J., September 8, 1950 (High Court, Dublin 1950); Richard E. Smith, *The Nonrecognition of Foreign Tax Judgments: International Tax Evasion*, 1981 U.Ill.L.Rev. 241 (1981); Recent Cases, *Conflict of Laws—Judgments—Canadian Court Will Not Entertain Suit to Enforce United States Tax Judgment—United*

*States v. Haarden* (Can.1963), 77 Harv.L.Rev. 1327 (1964).

**5.** 11 U.S.C. § 326(a); *see also* H.R.Rep. No. 595, 95th Cong., 1st Sess., at 327 (1977), reprinted in Appendix 2 Collier on Bankruptcy pt. II at 327 (Lawrence P. King ed., 15th ed. 1996) ("It should be noted that the bases on which the maximum fee is computed includes moneys turned over to secured creditors, to cover the situation where the trustee liquidates property subject to a lien and distributes the proceeds. It does not cover cases in which the trustee simply turns over the property to the secured creditor, nor where the trustee abandons the property and the secured creditor is permitted to foreclose.")

correct but begs the issue of the propriety of percentage compensation versus an hourly rate. Resolving this issue requires a review of the Bankruptcy Act and of the history of the enactment of the Bankruptcy Code to determine whether the compensation limits of section 326 are designed as an incentive scheme to encourage maximum asset collection and distribution to creditors by the trustee or are restricted to an hourly capped fee unrelated to the trustee's collection efforts to be set by the Court after the work is done.

The Bankruptcy Act of 1898 allowed to the trustee "commissions on sums to be paid as dividends and commissions as may be allowed by the courts," within stated percentages. 2 Collier on Bankruptcy ¶ 326.01 (Lawrence P. King ed., 15th ed. 1996). In 1903, the percentages were increased and Congress clarified that they were payable "on all moneys disbursed." *Id.* The 1938 Act rearranged former Section 48 and placed the provisions relating to trustees in subdivision *c,* and added a $100 minimum fee payable at the court's discretion. *Id.* In 1956, the scale of commissions in subdivision c(1) was increased, and the minimum discretionary fee was increased from $100 to $150. *Id.*

Thus, under the Bankruptcy Act, a liquidation trustee received a percentage commission on sums disbursed subject to a percentage cap. Section 48c "... seems to measure the amount, and perhaps even the difficulty, of the work on the basis of the size of the fund that the trustee supervises. Many other factors, such as the number of hours required of the trustee or the difficulty of the job in the referee's opinion, could have been selected to establish the maximum allowance,

but Congress has chosen this objective criterion." *In re Schautz,* 390 F.2d 797 (2nd Cir.1968) (citation omitted). A reorganization trustee under the Act was entitled to reasonable compensation for his service not subject to the cap of section 48c. 2 Collier on Bankruptcy ¶ 326.01 n. 6 (Lawrence P. King ed., 15th ed. 1996).

The legislative history to the enactment of the Bankruptcy Code states that trustees are compensated out of money of the estate "to provide an incentive to trustees to collect assets for the estate...." [6] Congress concluded that the Bankruptcy Act's provision for a $150 discretionary base fee to the trustee led to creditors in consumer cases receiving "virtually nothing," and created a disincentive for trustees to search for assets worth more than $150 to pay the fee because compensation remained at $150 unless he recovered $2,400 in assets.[7] By eliminating the $150 discretionary fee, Congress sought to restore "the incentive to private trustees to search out all assets...." H.R.Rep. No. 595, 95th Cong., 1st Sess. (1977), reprinted in Appendix 2 Collier on Bankruptcy pt. II at 109 (Lawrence P. King ed., 15th ed. 1996).

The cap of section 48c of the Act was retained in the Bankruptcy Code and the distinction in the method of compensation for liquidation and reorganization trustees was merged so that trustees in both capacities became entitled to reasonable compensation subject to a percentage cap. 2 Collier on Bankruptcy ¶ 326.01 n. 6 (Lawrence P. King ed., 15th ed. 1996). The term "commissions" used in the Bankruptcy Act was replaced by the term "compensation" in the Bankruptcy Code.[8]

---

6. H.R.Rep. No. 595, 95th Cong., 1st Sess. (1977) reprinted in Appendix 2 Collier on Bankruptcy pt. II at 93 (Lawrence P. King ed., 15th ed. 1996).

7. H.R.Rep. No. 595, 95th Cong., 1st Sess. (1977) reprinted in Appendix 2 Collier on Bankruptcy pt. II at 93–94 (Lawrence P. King ed., 15th ed. 1996). "Under the percentage fee schedule, a trustee must recover approximately $2400 in assets before the maximum percentage fee amounts to $150. Such a recovery is very unlikely in the average consumer bankruptcy case. Thus, the trustee has no incentive to search for assets worth more and $150 or $200, which is just

enough to pay for his fee. If he spends more time on the case and discovers assets worth $1500 or $2000, he still will not receive a fee of more than $150. The result is that the percentage fee system, designed originally to induce trustees to find assets, has been defeated in the smaller cases by the discretionary fee of $150." *Id.*

8. 2 Collier on Bankruptcy ¶ 326.01 n. 7 (Lawrence P. King ed., 15th ed. 1996); *See also* David Allard, *Fee Guidelines—Where did they come from and how will they affect us?,* NABtalk, Vol. 12, No. 2, Summer 1996, at 16, 19:

There is nothing in the legislative history to indicate that the replacement of the word "commissions" with the term "compensation" was intended to change the incentive nature of trustee compensation. In fact, in response to the Am.Bankr.Inst., *American Bankruptcy Institute National Report on Professional Compensation in Bankruptcy Cases* (G.R. Warner rep. 1991), Congress, in 1994, increased the maximum percentages allowed for trustee compensation calling this section of Pub.L. No. 103–394, 108 Stat. 4106, "Section 107. Increased incentive compensation for trustees."

**Trustee Function**

■■■■ The function of the trustee is different from that of all other professionals working for the estate. As stated in the Am.Bankr.Inst., *American Bankruptcy Institute National Report On Professional Compensation in Bankruptcy Cases* (G.R. Warner rep. 1991):

Central to the proper administration of the American bankruptcy system is the trustee in bankruptcy. Although, in most Chapter 11 cases, a debtor-in-possession performs the duties of a trustee, in the vast majority of the cases passing through the bankruptcy system a trustee is responsible for ensuring that the system works. It is the trustee who collects and reduces to money the assets of the estate, investigates the financial affairs of the debtor, reviews exemptions, files objections to claims, files objections to discharge, supervises distribution to creditors, and performs the other administrative tasks necessary to insure that creditors receive their due. The trustee's duties are even more extensive in Chapter 11 cases. Thus, it is essential to efficient bankruptcy administration that persons of high ability

and integrity be attracted to trustee service.

. . . .

Further, even within the limitation set by the section 326(a) fee cap, the trustee's reasonable fee may be computed differently from a professional's reasonable fee. Although most of the reported decisions deal with the section 326(a) cap, rather than the method of determining trustees' fees when the cap is not a factor, it appears that a majority employ the lodestar approach to trustees' fee determinations. Some courts, however, reject that approach as inappropriate in light of the significant difference between the functions performed by trustees and those performed by the professionals employed by trustees. In these courts especially, the results obtained in the case play a far greater role in determining reasonable compensation for trustees than they do with respect to the compensation of professionals. As noted recently in *In re Rauch*, [110 B.R. 467 (Bankr.E.D.Cal.1990)], "[T]he Code itself demands favorable results, as trustees are only paid pursuant to a turnover of money ... Success is the test applied by the business world in measuring compensation. It is largely so in the courts."

*Id.* at 205–206 (citations omitted).

■■■■ Further, as stated in *In re Abraham*, 163 B.R. 772 (Bankr.W.D.Tex.1994):

There is one trustee "duty" that can never be delegated, and for which the trustee must always be held accountable—and for which trustees should justifiably be compensated, even if all actual work is being performed by others. The trustee and

Historically, Congress has seen fit to compensate trustees in liquidation cases on a commission basis for almost a century since the passage of the first permanent federal bankruptcy legislation known as "The Bankruptcy Act of 1898" (the "Act"). Section 48 of the Act, as amended through the years until the passage of the Code in 1978, steadfastly demanded that trustees be paid by commissions, despite numerous amendments to the Act and the Code....

In 1978, in response to the perception of excessive fees held at the time, the maximum

statutory fees for both Chapter 7 and 11 trustees were substantially reduced and, although the word "commission" was changed to "compensation," Congress did not change the fundamental nature of paying trustees for their services. It recognized that commission payments upon disbursements of funds to creditors enhanced the expeditious closing of estates and the payment of dividends, along with the liquidation of assets for the highest prices available, and that it also encouraged the search for hidden assets.

only the trustee is ultimately responsible for the administration of the estate, including most significantly the safeguarding and responsible disposition of estate assets and their distribution to creditors. We expect the trustee to make sure that all those persons to whom duties have been delegated do their jobs right—or else. The trustee can not delegate the ultimate responsibility or the decision making that is part and parcel of her office. She is the one who decides who to hire and whether to hire. She alone decides how an estate asset is to be disposed of, albeit with input from an assistant. She alone must make sure that the estate is administered expeditiously. For that increasingly heavy responsibility, the trustee must be compensated, even if the trustee personally does nothing else in the case.

Because the role of the trustee differs from that of other estate professionals, Congress distinguished the compensation available for trustees under 11 U.S.C. § 326 from that available under 11 U.S.C. § 328 for all other professionals hired for the estate. The Bankruptcy Code provides as follows for trustee and professional compensation:

**§ 326. Limitation on compensation of trustee.**

(a) In a case under chapter 7 or 11, the court may allow reasonable compensation under section 330 of this title of the trustee for the trustee's services, payable after the trustee renders such services, not to exceed fifteen percent of the first $1,000 or less, six percent on any amount in excess of $1,000 but not in excess of $3,000, and three percent on any amount in excess of $3,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims.

(b) In a case under chapter 12 or 13 of this title, the court may not allow compensation for services or reimbursement of expenses of the United States trustee or of a standing trustee appointed under section 586(b) of title 28, but may allow reasonable compensation under section 330 of this title of a trustee appointed under section 1202(a) or 1302(a) of this title for the trust-

ee's services, payable after the trustee renders such services, not to exceed five percent upon all payments under the plan.

(c) If more than one person serves as trustee in the case, the aggregate compensation of such persons for such service may not exceed the maximum compensation prescribed for a single trustee by subsection (a) or (b) of this section, as the case may be.

**§ 328. Limitation on compensation of professional persons.**

(b) If the court has authorized a trustee to serve as an attorney or accountant for the estate under section 327(d) of this title, the court may allow compensation for the trustee's services as such attorney or accountant only to the extent that the trustee performed services as attorney or accountant for the estate and not for performance of any of the trustee's duties that are generally performed by a trustee without the assistance of an attorney or accountant for the estate.

The limits of both sections 326 and 328 are incorporated into the compensation section of the Bankruptcy Code, section 330. Under section 330 and subject to the limits of sections 326 and 328, a professional hired by the estate may be awarded reasonable compensation for actual, necessary services rendered.

**§ 330. Compensation of officers.**

(a) After notice to any parties in interest and to the United States trustee and a hearing, and subject to sections 326, 328, and 329 of this title, the court may award to a trustee, to an examiner, to a professional person employed under section 327 or 1103 of this title, or to the debtor's attorney—

(1) reasonable compensation for actual, necessary services rendered by such trustee, examiner, professional person, or attorney, as the case may be, and by any paraprofessional persons employed by such trustee, professional person, or attorney, as the case may be, based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable ser-

vices other than in a case under this title; and

(2) reimbursement for actual, necessary expenses.

The 1994 Amendments to the Code clarify the factors to be considered in determining a reasonable fee subject to the percentage cap. *See* 11 U.S.C. § 330(a)(3)(A). These factors are similar to the *Johnson* factors adopted by the Fifth Circuit years ago to be utilized in evaluating the reasonableness of attorneys fees. *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974).

*Johnson* was a class action for damages and an injunction against employment discrimination under Title VII of the Civil Rights Act of 1964. Under the fee shifting provisions of the Civil Rights Act (§ 706(k) of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e–5(k) which provides that the court in its discretion may award a prevailing party a reasonable attorney's fee as part of the cost of the litigation) the plaintiff's attorneys sought an award of their attorneys' fees based on an hourly rate times the hours expended. The Fifth Circuit found the district court's award of fees to have no correlation to the facts and figures submitted by the plaintiff. The district court's award of fees without explanation failed to compensate ⅓ to ½ of the hours requested by plaintiff. 488 F.2d at 716. Therefore, the Fifth Circuit remanded for reconsideration in light of guidelines it set forth in the case. 448 F.2d at 717.

The *Johnson* factors are as follows:

(1) the time and labor required;

(2) the novelty and difficulty of the questions;

(3) the skill requisite to perform the legal service properly;

(4) the preclusion of other employment by the attorney due to acceptance of the case;

(5) the customary fee;

(6) whether the fee is fixed or contingent;

(7) time limitations imposed by the client or the circumstances;

(8) the amount involved and the results obtained;

(9) the experience, reputation and ability of the attorneys;

(10) the "undesirability" of the case;

(11) the nature and length of the professional relationship with the client; and

(12) awards in similar cases.

*Johnson,* 488 F.2d at 719.

In enunciating the "*Johnson* factors", the Fifth Circuit emphasized, "The customary fee for similar work in the community should be considered. It is open knowledge that various types of legal work command differing scales of compensation." 488 F.2d 714, 718. The Fifth Circuit emphasized "The reasonableness of a fee may also be considered in the light of awards made in similar litigation within and without the court's circuit." 488 F.2d at 719.

Subsequent to *Johnson,* the Fifth Circuit in *Rose Pass Mines, Inc. v. Howard,* 615 F.2d 1088 (5th Cir.1980) affirmed an award of the maximum statutory percentage allowance under Bankruptcy Act section 48c(2) without regard to application of the *Johnson* factors for trustee compensation. Section 48c(2) permitted the court to award a trustee who is conducting business twice the maximum allowance it may award trustees who do not conduct the business of the bankrupt. 615 F.2d 1088, 1090. While affirming the award of percentage compensation to the trustee in all respects without regard to application of the *Johnson* factors, the Fifth Circuit then scrutinized the bankruptcy court's application of the *Johnson* factors to its award of compensation to the attorney for the trustee, stating:

In awarding attorneys' fees, a bankruptcy court must consider the twelve factors outlined in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir. 1974), to facilitate meaningful review. *In re First Colonial Corp. Of America,* 544 F.2d at [1291] 1298–99 [ (5th Cir.1977) ].

615 F.2d 1088, 1091–1092.

Thus, the Fifth Circuit recognizes a distinction in the compensation available to trustees under the maximum statutory percentage caps and that available to attorneys. Indeed, in the context of maximum local caps

on attorney compensation, the Fifth Circuit held in *In re U.S. Golf Corp.*, 639 F.2d 1197, 1206 (5th Cir.1981), "It is simply not possible to seriously weigh the *Johnson* factors in the face of an absolute maximum fee."

Subsequent to *Johnson,* the appropriateness of the court's consideration of any factors other than hourly rate multiplied by hours worked (the "lodestar") in evaluating reasonable attorney's fees has become more and more restricted[9] which has conversely led to a backlash to increasing use of percentage based compensation for attorneys fees in common fund cases, to which a bankruptcy estate is analogous.[10]

Indeed the Fifth Circuit, although declining for the present to adopt as a rule percentage based compensation for attorneys fees in common fund cases, affirmed the district court's determination of reasonable attorneys fees under a combined approach using both the *Johnson* factors and a percentage of the fund basis in *Longden v. Sunderman,* 979 F.2d 1095, 1100 (5th Cir. 1992), a securities fraud common fund class action. "That the district court also calculated fees on a percentage of the total recovery basis merely demonstrated its preference for that method as a matter of policy." 979 F.2d 1095, 1100 n. 11. Specifically endorsing the district court's award of 27.5% of the total fund of $19.2 million to certain of the attorneys, the Fifth Circuit stated:

> The district court acted well within its discretion in awarding an aggregate sum to the Susman Attorneys that was based on their collective efforts, leaving apportionment of that sum up to the Susman Attorneys themselves.

979 F.2d 1095, 1101.

The Supreme Court has never adopted the lodestar method for common fund cases. In *Blum v. Stenson,* 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 1550 n. 16, 79 L.Ed.2d 891 (1984), the court stated that under the "common fund doctrine" a reasonable attorney fee "is based on a percentage of the fund bestowed on the class."

Trustees do not have to be attorneys. Moreover, the Bankruptcy Code does not require professionals for the estate to bill solely at an hourly rate. *See* 11 U.S.C. § 328(a) (explicitly authorizing contingent fee compensation.) Some courts recognize the differences in the functions of trustees and attorneys and distinguish their methods of compensation; other courts apply a lodestar analysis to trustee compensation which has led to inconsistent requirements for time rec-

---

**9.** The lodestar may be adjusted according to a *Johnson* factor only if that factor is not already taken into account by the lodestar. *See e.g., Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 483 U.S. 711, 727–728, 107 S.Ct. 3078, 3087–88, 97 L.Ed.2d 585 (1987) (citing *Blum v. Stenson,* 465 U.S. 886, 898–901, 104 S.Ct. 1541, 1548–50, 79 L.Ed.2d 891 (1984)) (enhancement for the risk of nonpayment reserved for exceptional cases); *Transamerican Natural Gas Corp. v. Zapata Partnership, Ltd. (In re Fender),* 12 F.3d 480, 486–487 (5th Cir.1994) *cert. denied,* —— U.S. ——, 114 S.Ct. 2165, 128 L.Ed.2d 888 (1994) (enhancement of the lodestar was not justified because the trial court improperly double counted factors 2, 3, 9, and 8 which were already accounted for in the lodestar amount).

**10.** The district court in *Strang v. JHM Mortg. Sec. Ltd.,* 890 F.Supp. 499, 502–503 (E.D.Va.1995) stated:

> Although the Fourth Circuit has not yet ruled on this issue, the current trend among the courts of appeal favors the use of a percentage method to calculate an award of attorneys' fees in common fund cases. *See e.g., Rawlings v. Prudential–Bache Properties, Inc.,* 9 F.3d 513, 516 (6th Cir.1993) (district court could use either method in awarding fees); *Swedish Hosp. Corp. v. Shalala,* 1 F.3d 1261, 1271 (D.C.Cir.1993) (court has discretion to award fees as percentage of the fund); *Longden v. Sunderman,* 979 F.2d 1095, 1099 (5th Cir. 1992) (affirming use of percentage method to calculate attorneys' fees); *Camden I Condominium Ass'n v. Dunkle,* 946 F.2d 768, 774 (11th Cir.1991) (percentage method is preferable in common fund cases); *Harman v. Lyphomed, Inc.,* 945 F.2d 969, 975 (7th Cir.1991) (percentage method may be used in appropriate cases); *Paul, Johnson, Alston & Hunt v. Graulty,* 886 F.2d 268, 272 (9th Cir.1989) (fees may be awarded as a percentage of common funds); *Brown v. Phillips Petroleum Co.,* 838 F.2d 451, 454 (10th Cir.1988) (fee award as percentage of common fund not abuse of discretion).

ords of trustees and inconsistent awards of compensation.[11]

Percentage of the fund compensation is subject to the criticism that no rational relationship may exist between the size of the fund and the percentage sought as fees and that such a compensation scheme promotes the proliferation of class action lawsuits. Further, in the context of a class action, recovery of a large common fund may simply be due to the number of class members rather than the skill of the attorney further attenuating any relationship between a percentage award of attorneys fees to the effort involved in achieving the result.[12] In class action suits, furthermore, the "reasonable" percentage fees awarded are usually 25 to 30 percent of the common fund [13] created result-ing in a much diminished distribution to successful class plaintiffs and subjecting plaintiffs' attorneys to the criticism that they have received a windfall through little effort.

The compensation scheme enacted by Congress for trustee's fees, however, resolves these issues with a results-oriented sliding-scale percentage of the fund method of compensation for trustees. By incorporating both percentage-based compensation and a reasonableness analysis, Congress creates an incentive to trustees to search for all assets to maximize distribution to creditors as well as promotes a rational relationship between the effort expended and results obtained.

Moreover, by using a sliding percentage scale for trustee commissions, Congress has

11. See e.g., In re United States Trustee, 32 F.3d 1370, 1373 (9th Cir.1994) (Referring to trustee compensation as "the incentive scheme created by section 326(a)" the Ninth Circuit stated, "Congress specifically limited trustees' compensation in certain respects, making trustees' compensation different from that of attorneys"); In re Spungen, 168 B.R. 373 (N.D.Ind.1993) (trustee receives a percentage of the funds disbursed); In re Butterbaugh, 135 B.R. 507 (Bankr.N.D.Ohio 1991) (Code provides separate compensation systems to the trustee and trustee's counsel based on their distinct expertise and function in a bankruptcy case); In re Rauch, 110 B.R. 467, 473–475 (Bankr.E.D.Ca.1990) ("A significant difference exists between the functions performed by attorneys and those functions performed by trustees.... The Legislature obviously decided that the time element for trustee's fees is not the only element to be considered or there would be no reason for § 326(a) establishing a maximum fee based upon percentages of monies brought into and disbursed from the estate."); In re Stanley, 120 B.R. 409 (Bankr.E.D.Tex.1990) ("Trustee's compensation is referred to interchangeably as commission or maximum compensation, and this court could locate no jurisprudence which provided any standards for the Trustee to establish the complexity of the work involved in administering the case or the time involved in the work of administering the case or any other method of determining reasonable compensation other than applying the maximum percentages in section 326(a) to a figure which represented that court's concept of 'all monies disbursed or turned over' in the case."); In re Shades of Beauty, Inc., 56 B.R. 946, 949 (Bankr.E.D.N.Y.1986) aff'd in part and remanded in part on other grounds, 95 B.R. 17 (E.D.N.Y.1988) ("Although many trustees are attorneys at law ... the allowance of statutory commissions for a trustee does not contemplate the trustee's rendering legal services.")

The services that a trustee performs for an estate without the aid of counsel are compensable under Section 326 of the Code, while legal services rendered either by the trustee or his retained counsel are compensable under Section 328. In re Wilmon, Inc., 61 B.R. 989 (Bankr. W.D.Pa.1986) (trustee compensation is calculated on percentage of monies brought into the estate by trustee's service); In re Taylor, 66 B.R. 390 (Bankr.W.D.Pa.1986) (Compensation for trustee determined by a percentage of the total monies received through the trustees services.); In re Draina, 191 B.R. 646 (Bankr.D.Md.1995) (court analyzed factors, including trustee's hourly rate for attorney services then awarded compensation midway between percentage commission sought and calculation under lodestar); In re Gulph Woods Corp., 150 B.R. 603 (E.D.Pa. 1993) (bankruptcy court rejected percentage compensation under 326(a) and awarded compensation only for itemized hours at a rate the court established, but district court vacated and remanded for further consideration of cost of comparable services and value of the trustee's services to the estate); In re Roco Corp., 64 B.R. 499, 504 n. 7 (D.R.I.1986) ("There is an analogous problem too, deciphering the applicable rate to be applied to whatever hours the trustee may have devoted to his duties.... A trustee need not be a lawyer, and the reasonable value of the efforts ought to be surveyed based on what is involved, and upon the amount of time productively spent, not necessarily upon who is involved.").

12. See generally, Monique Lapointe, Note, Attorneys Fees in Common Fund Actions, 59 Fordham L.Rev. 843 (1991).

13. See e.g., Torrisi v. Tucson Elec. Power Co., 8 F.3d 1370, 1376 (9th Cir.1993) ("In common fund cases ... we have established 25% of the common fund as the 'benchmark' award for attorney fees."), cert. denied sub nom., Reilly v. Tucson Elec. Power Co., —— U.S. ——, 114 S.Ct. 2707, 129 L.Ed.2d 834 (1994).

ensured that the greater proportional effort required at the beginning of a case is commensurately rewarded and that the diminishing effort required as a case proceeds results in a reduced percentage commission. Furthermore, the very small percentage caps set by Congress on the largest amounts disbursed obviates the reasonableness criticisms applicable to class action percentage of the fund compensation.

■■■■■ The IRS contends that there is no point in submitting time records if the trustee is to receive percentage based compensation. This contention reflects a misapprehension of the role of time records in the Court's determination of reasonable compensation. Time records do not simply record the number of hours worked; they detail the type of work done. Regardless of the method of compensation and regardless of the type of professional fees at issue, the Court must evaluate the complexity and necessity of work done on behalf of the estate in order to determine appropriate compensation. The trustee, like other professionals for the estate, must demonstrate the reasonableness of his requested fee by showing that the case required work and that he, in fact, performed that work and did not simply delegate all activity to other professionals. Nevertheless, consideration of the necessity for trustee time records has generated diverse requirements on trustees.[14]

■■■■■ Delegation of work is permissible and at times necessary but a trustee who delegates all work cannot expect maximum compensation under the Bankruptcy Code. Likewise, where a trustee is engaged in simple collection and disbursement the maximum fee may not be .appropriate. *In re McNar, Inc.*, 120 B.R. 149 (Bankr.S.D.Cal. 1990) (Court awarded hourly rate of less than the maximum percentage allowable where estate involved relatively few assets and little work and trustee's involvement was routine.)

■■■■■ Section 326 of the Bankruptcy Code which sets the percentage caps on trustee fees is paralleled by section 328 of the Bankruptcy Code which caps the compensation available to other professionals, including attorneys, who seek compensation from the estate. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. (1977), reprinted in Appendix 2 Collier on Bankruptcy pt. II at 328 (Lawrence P. King ed., 15th ed. 1996) ("This section, which is parallel to section 326, fixes the maximum compensation allowable to a professional person employed under section 327.") Accurate time records assist in maintaining compliance with the admonition of section 328(b) that where a trustee serves also as an attorney to the estate, he may not be compensated in that capacity for services generally performed by the trustee without an attorney. This provision is intended to avoid the double compensation to the trustee that would result if the trustee obtained a percentage commission on disbursements and also billed the estate at an hourly rate under the guise of an attorney's fee for work

---

**14.** *See e.g., In re Greenley Energy Holdings of Pennsylvania, Inc.*, 102 B.R. 400, 405 (E.D.Pa. 1989) (Distinguishing trustee fees from attorneys fees, the court stated, "... a trustee typically performs functions different from the average attorney.... To require the trustee to keep detailed time records traditionally required to be kept by attorneys seeking fees would be unduly burdensome.... The Bankruptcy Code itself demands results, since the trustee's compensation is limited to a percentage of the money turned over, regardless of the amount of time spent on the case."); *In re Missionary Baptist Foundation*, 77 B.R. 552, 554 (Bankr.N.D.Tex.1987) ("While it might be desirable for a Trustee to have the same type of time records as are presented in connection with an application for attorney's fees, this Court does not feel that a Trustee in order to recover compensation upon which there are maximum limits by the statute should be held to the same record-keeping requirements as an attorney."); *In re Doctors, Inc.*, 4 B.R. 346, 348 (Bankr.E.D.Pa.1980) (In awarding commission under 48c(1) of the Bankruptcy Act, the court stated, "There was no duty on the trustee to keep an accurate record of the hours he spent in performing his duties as fiduciary, and his estimate of his time spent has probative value in determining the commissions to be awarded to him."); cf. *In re Roderick Timber Co.*, 185 B.R. 601 (9th Cir. BAP 1995) (Recognizing "some conflict in the case law", nevertheless failure to keep time records grounds for reversal of award to trustee seeking percentage based compensation); *In re Churchfield Management & Inv. Corp.*, 98 B.R. 838, 891 (Bankr.N.D.Ill.1989) (Noting that "in this District and many other Districts, time records have rarely been required for trustees," nevertheless court disallowed a portion of fees requested for failure to keep time records for trustee work.)

he would have done anyway as trustee.[15] *See e.g., In re Riker Indus., Inc.,* 122 B.R. 964 (Bankr.N.D.Ohio 1990) (Court reduced attorney's compensation for services properly performed by the trustee and compensated by the trustees commission), *In re Daily Medical Equipment, Inc.,* 150 B.R. 205 (Bankr.N.D.Ohio 1992) (duplication of effort by trustee and attorney remedied by reduction of attorney's fee, so no need to reduce trustee's commission.)

■ In order to avoid doubly compensating the trustee when he functions as trustee and attorney for the estate and to avoid compensating other professionals for work that would ordinarily be performed by the trustee, the Federal Rules of Bankruptcy Procedure require all professionals to file a detailed fee application describing the time expended and work done. Fed.R.Bankr. P.Rule 2016; *see also In re Orbit Liquor Store,* 439 F.2d 1351, 1354 (5th Cir.1971) (Trustee received total statutory commission plus attorneys fees as attorney for the trustee. Fifth Circuit stated "Where a trustee also serves as attorney and his award of attorney's fees is challenged, we think he must present a time sheet showing only his attorney's activities."); *In re Evangeline Refining Co.,* 890 F.2d 1312, 1326–1327 (5th Cir.1989) ("... [W]here the trustee also serves as attorney ... time records should distinguish with reasonable specificity the legal services for which compensation is claimed as an attorney from the administrative tasks of the trustee.... [I]nherent dangers of duplicative charging by the attorney and trustee for the same work are present.")

Based on this Court's knowledge of the case and upon the time records submitted by the trustee, the Court finds that the following *Johnson* factors support the reasonableness of the trustee's proposed maximum statutory percentage compensation:

*Novelty and difficulty of the questions presented in the case.*

This case has been highly unusual. It has involved allegations of domestic tax fraud, international money laundering, criminal activity, and sophisticated manipulation of accounting and tax results to portray false results. Essentially, the trustee was forced to become in effect the CEO and/or the CFO of a vast real estate and oil and gas business with interests in numerous foreign countries. Except in oil and gas matters, the trustee had no meaningful management personnel who could assist him in handling the operation of the estate's multifaceted business interests.

*The skill required to perform the services properly.*

This case required a highly experienced and able trustee to locate and organize debtor's records; to hire and direct the activities of world-wide attorneys handling estate litigation and oil and gas consultants handling estate operations; to successfully collect and liquidate the assets of this estate despite strong opposition from debtor's insiders; and to develop a successful plan resulting in a large distribution to unsecured creditors.

*Preclusion of other employment due to the acceptance of this case.*

Time constraints have required the trustee to decline representation in other business litigation matters during this Chapter 11 case. Preclusion of other business became less of a factor as the case progressed because the trustee's attention to emergency matters

---

15. H.R.Rep. No. 595, 95th Cong., 1st Sess. (1977), reprinted in Appendix 2 Collier on Bankruptcy pt. II at 329 (Lawrence P. King ed., 15th ed. 1996) states:

Subsection (b) limits a trustee that has been authorized to serve as his own counsel to only one fee for each service. The purpose of permitting the trustee to serve as his own counsel is to reduce costs. It is not included to provide the trustee with a bonus by permitting him to receive two fees for the same service or to avoid the maxima fixed in section 326. Thus, this subsection requires the court to differentiate between the trustee's services as trustee, and his services as trustee's counsel, and to fix compensation accordingly. Services that a trustee normally performs for an estate without assistance of counsel are to be compensated under the limits fixed in section 326. Only services that he performs that are normally performed by trustee's counsel may be compensated under the maxima imposed by this section.

lessened after the first nine months of the case.

*The customary fee and awards in similar cases.*

The requested compensation is within the limits prescribed by 11 U.S.C. § 326. While there is no prevailing hourly rate in the community for the type of work accomplished by the trustee, there is a prevailing percentage compensation rate in this community for exceptional trustee accomplishments, and that rate is the maximum compensation permitted under 11 U.S.C. § 326(a). This Court has reviewed recent cases in the Southern District of Texas which reflect compensation awarded in large liquidation and reorganization cases. Despite the lack of uniformity in trustee record keeping and in time expended in performance of trustee duties, compensation has been awarded in the handful of extremely large cases close to or at the maximum compensation allowed by the Bankruptcy Code.

In *In re: Tomlinson Interests, Inc.*, Case No. 84–03173, an oil and gas chapter 7 involving multiple debtors jointly administered which converted to chapter 11 and confirmed a plan after seven years of work by the appointed trustee, generated millions in disbursements. The trustee sought the maximum compensation available under the Code. After hearing evidence regarding trustee compensation awarded in other large cases and the cost of comparable services in the market place, the court awarded $3,100,-000.00 on the trustee's request for the maximum compensation of $3,445,192.00 based on disbursement of $345,519,211.00. The time expended by the trustee was not identified.

In *In re: J.R. McConnell, Jr.*, Case No. 86–10017–H3–11, an involuntary chapter 7 case whose assets were real estate investments and developments and which involved a major fraud scheme and ultimately an indictment against the debtor for bank fraud, the trustee sought and the court awarded interim compensation at the maximum allowed under the Code, resulting in trustee fees of $648,205.81 as of the fifth interim award of fees on July 22, 1992, on disburse-ments of $21,600,860.40. The time expended was not identified.

In *In re: Major Funding Corp.*, Case No. 87–01026–H3–11, a case involving a mortgage brokering business initiated as a chapter 11 for which a trustee was appointed due to the incompetence and gross mismanagement of the debtor whose irregular activities prompted a pre-petition consumer protection suit by the Attorney General of the State of Texas, the trustee sought and the court awarded the maximum compensation allowable under 11 U.S.C. § 326, resulting in an award of $142,-330.39 on disbursement of $4,738,346.27 and time expended of over 800 hours.

In *In re: Shearn Moody*, Case No. 86–2314, a case involving litigious and uncooperative insiders of the debtor, fraudulent activity by insiders, third party efforts to place assets beyond the trustee's control, and an unusual mix in the estate's asset portfolio, the trustee conducted a managed liquidation of the estate which paid creditors a substantial dividend on their claims. Under the confirmed Moody plan of reorganization, the trustee disbursed cash and property in kind totaling approximately $12 million. The trustee's fee in that case was $425,000 (3.5%), and the total professional compensation in that case exceeded $3 million (25%).

In *In re: O. Dean Couch, Jr.*, Case No. 86–09299–H2–11, the chapter 7 report of distribution reflects gross réceipts of $17,783,-840 and trustee compensation of $563,944. There was no distribution to unsecured creditors in that case. The final report before distribution states that there were filed thousands of claims totaling in excess of $200,-000,000.

Lastly, the Court notes that in an unreported decision in January 1995, the bankruptcy court approved compensation of $4.25 million for the trustee of Eastern Airlines. The Plan proposed by the trustee and the unsecured creditors committee provided distributions totaling $30 million to former employees and holders of other general unsecured claims. 1995 WL 120715; 1995 WL 87211.

*Whether the fee is fixed or contingent.*

The issue of fixed or contingent fees is not applicable directly. When the trustee was appointed in this case, GDC insiders represented that the value of the estate was far less than the trustee ultimately recovered for the benefit of creditors. Without reservation, the trustee never hesitated to deploy the substantial personal time and estate resources necessary to protect the interests of the estate.

*The amount of time involved and the results obtained.*

During the period, the trustee spent a total of approximately 1,400 hours on this case. In two and one half years, the trustee coordinated management, administrative, and legal actions that have resulted in a recovery of approximately $80 million in cash for the estate and confirmation of a plan of reorganization that will generate over an 88% dividend on general unsecured claims, including the IRS' penalty claim. These extraordinary results, especially given the difficult circumstances under which it was achieved, represent another factor supporting the trustee's proposed compensation in this case.

■ Moreover, as noted previously, speed in bankruptcy administration is a desirable trait. The speed with which the trustee has liquidated the estate assets is commendable and has resulted in savings to the estate in administrative costs. As the plan in the instant case provides for liquidation of the debtor, a recent study by the government accounting office which analyzed statistics for large chapter 7 liquidations provides useful comparisons to the instant case.[16] According to the report, the median disposition time for chapter 7 business cases was 3.8 years. In chapter 7 cases generating greater than $500 thousand in gross receipts the percentage distributed to all professional fees, trustee compensation, and other expenses was between 25% and 30% of the gross receipts. In chapter 7 cases generating greater than $500 thousand in gross receipts which were closed in less than or equal

to three years the percentage of gross receipts paid for all professionals compensation fees and expenses was approximately 20% of gross receipts; this percentage increased to approximately 30% for cases closed in greater than three years and less than or equal to seven years; and increased to approximately 35% for those cases closed in greater than 7 years. In cases with gross receipts greater than or equal to $500,000 that were originally filed as chapter 11 then converted to chapter 7, the percentage distribution to professional fees, trustee compensation, and all expenses were 31.5% of gross receipts.

In contrast, the professional fees and expenses in this case of $6,356,399 are approximately 7.9% of gross receipts of approximately $80 million in the case. The quick resolution of this case by the trustee has saved the estate administrative expenses over the GAO reported average costs.

*The experience, reputation and ability of the professionals and paraprofessionals who performed virtually all of the services in the case.*

Mr. Askanase is a longtime and well-respected member of the Houston bankruptcy bar. A longtime resident of Houston, Mr. Askanase received a Bachelor of Science degree in economics from the University of Pennsylvania in 1958 and an L.L.B. degree from Harvard University in 1962. After becoming a member of the Texas bar in 1962, Mr. Askanase quickly became an active member of the Houston insolvency and reorganization bar, and developed a substantial legal practice in the areas of insolvency and business reorganizations. He is presently a senior partner in the Houston law firm of Hughes, Watters & Askanase, L.L.P., and a longtime member of the Standing Panel of Bankruptcy Trustees for the Southern District of Texas. Mr. Askanase is board certified in consumer bankruptcy law and business bankruptcy law by the State Bar of Texas, and is board certified in business bankruptcy law by the Commercial Law League of America Academy of Commercial and Bankruptcy Law Spe-

---

16. GAO/GGD–94–173, United States General Accounting Office, Report to the Chairman, Subcommittee on Economic & Commercial Law,

Committee on the Judiciary, House of Representatives, Bankruptcy Administration Case Receipts Paid to Creditors and Professionals (July 1994).

cialists. He is a bankruptcy specialist with 20 years experience.

### The undesirability of the cases.

This case has both desirable and undesirable characteristics. Among the desirable characteristics of the case are the following:

The trustee had the opportunity to work on a variety of complex and interesting issues involving multiple jurisdictions and conflicting legal structures with many good results on emergency bases;

The major creditor, the IRS, despite conflict with the trustee's position at various stages of the case, has by its counsel, impressed this Court with its professionalism throughout this case. An example of such professionalism was the IRS' cooperation with the trustee in accelerating the litigation regarding a portion of the IRS' claim, and the IRS' settlement with the trustee once that litigation was adjudicated by this Court.

On the other hand, the case has had several unattractive characteristics, including the following:

Cooperation from GDC insiders was nonexistent. As a result, the trustee has been required to render substantial management effort and expenses that would have otherwise been unnecessary if even a small amount of cooperation had been forthcoming;

A substantial amount of the legal and administrative work in the case has been emergency litigation work to prevent or rectify fraud and outright looting of the estate. Although challenging, this type of legal work is physically draining and of questionable professional fulfillment.

At certain times, particularly during the first nine months of the case, the case practically encompassed all the trustee's time. The trustee is a senior partner in a medium-sized law firm that depends upon him to generate a substantial amount of its business. Consequently, the time demands of this case prevented him from maintaining his customary policy of providing legal services over as large a number of separate cases and clients as possible.

Lastly, the Court notes that while it is common for a trustee to employ his own firm to do legal work for the estate, the trustee did not do so in this case, thereby, avoiding even the slightest appearance of impropriety. Self-employment as counsel for the trustee would have been a lucrative method to ensure payment for some work in the case regardless of the outcome of his application for trustee fees.

The Court is mindful of the findings of the GAO report and the ABI study. The GAO study found that income from a trustee's self-retention as attorney for the trustee may be a significant source of trustee income. This finding comports with that of the ABI report leading it to conclude:

> The survey data suggest that trustees are under-compensated for their trustee work. The data also suggest that competent trustees are not abandoning the system and that, overall, the trustees' combined income from all sources is roughly comparable to the income that could be earned as a bankruptcy professional. Thus, some factor, or group of factors, must be at work moderating the harshest effects of the under-compensation problem. Unless and until the missing safety valve factor, or factors, can be isolated, attempts to alter the trustee reimbursement practices or the self-employment practices, without also remedying the under-compensation problem, could prove disastrous.

Am.Bankr.Inst., *American Bankruptcy Institute National Report on Professional Compensation in Bankruptcy Cases* (G.R. Warner rep. 1991) at 215.

The Court finds that the *Johnson* factors fully support an award of the maximum compensation to the trustee under 11 U.S.C. § 326. The trustee has amply rebutted any presumption that the lodestar fully reflects the novelty and complexity of the issues, the special skill and experience of the trustee, the quality of representation, and the results obtained in this rare and exceptional case.

It is, therefore, **ORDERED** that the trustee is allowed compensation in the total

amount of $2,398,348.63 in fees plus $15,-833.42 in expenses.